STANDARD OIL Co. *et al. v.* HENLEY *et al.*

(In Banc.   March 25, 1946.)

[25 So. (2d) 400.   No. 35997.]

**Lyell & Lyell** of Jackson and **Henley, Jones & Woodliff,** of Hazelhurst and Jackson, for appellants.

McNeil, Jones, Goss & Zama, and J. H. Garth, all of Hazlehurst, and Barnett, Barnett, Jones & Stone, of Jackson, for appellees.

Argued orally by **W. S. Henley** and **G. G. Lyell, Sr.**, for appellants, and by **Roy J. Goss** and **Ross R. Barnett**, for appellees.

**Griffith, J.**, delivered the opinion of the court.

About six o'clock on Saturday afternoon, July 17, 1943, Willis W. Henley went to the Bailey Service Station in Crystal Springs, and presented to Bailey, the proprietor, a five gallon can, requesting that he fill it with kerosene. Bailey handed the can to Jones, a negro attendant who worked at the station only on Saturday afternoons, and directed the attendant to draw the kerosene from a kerosene container separately kept in a small storeroom by the side of the main station building, and both Henley and Bailey saw the negro go with the can to the kerosene storeroom, but Henley and Bailey then went on into the main office. The negro says that he filled the can with kerosene from the kerosene container and took it to the rear end of Henley's car and called to the others that it was there, and that before Henley came back to the car he, Jones, had put the can in the rear or trunk end of the car.

When, according to his testimony, Henley returned to the car he locked the rear compartment with the can therein, and when he reached home he left the can locked in the car, but that about eight o'clock on Sunday night following he unlocked the car compartment, took the can therefrom, and placed it in what in the record is called a junk room near the kitchen. About twenty or thirty minutes later Carrol Henley, the twelve-year-old son of Henley, saw that the kerosene lamp in the livingroom needed fuel, and says that he went to the junk room, where he says he had seen his father place the can, obtained a can, and, in the course of filling the lamp an explosion occurred, as a result of which the eight-year-old daughter of Willis Henley, and the sister of the boy, was

so seriously burned that she died on the Wednesday following.

The can from which the boy was filling the lamp was found to contain gasoline instead of kerosene, and suit was brought against the Standard Oil Company and Bowen, its wholesale distributor, charging that without Bailey's knowledge the defendants had placed gasoline instead of kerosene in the kerosene container at the service station. From a verdict and judgment upholding this charge the defendants appeal. Bailey was not sued, the case being tried on the theory that Bailey was not an agent of the defendants, and the court so instructed the jury, from which there is no cross-appeal.

To meet the charge against them that they placed gasoline instead of kerosene in the service station kerosene container, the defendants showed as follows:

For more than four years all the gasoline handled by the Standard Oil Company in this territory was colored red, while its kerosene was water white. Its bulk station at Crystal Springs has a separate storage tank, No. 3, for kerosene, which was regularly inspected and certified by state authorities. The deliveries by the oil company to the Bailey station were made by a tank truck which had a separate compartment No. 5 for kerosene, drawings from which were from a faucet into five gallon open pails.

On Wednesday, July 14, 1943, late in the evening Lancaster in charge of the tank truck, and the only person making deliveries for the defendants in that particular territory, loaded the kerosene compartment No. 5, then entirely empty, with 149½ gallons of kerosene, its full capacity, taking the kerosene from bulk tank No. 3, and on Thursday morning, July 15, 1943, as his first delivery of kerosene he delivered to the Bailey Service Station 55 gallons, or 11 pails full, which he personally poured into the station kerosene container, witnessed by Bailey personally, and both testified that this delivery was of water white kerosene, as both could easily see, and did see as it was delivered by open pails. This was approximately

the capacity of the station kerosene container, and there was only one kerosene container at the Bailey station.

Lancaster's deliveries of kerosene on that day were 110 gallons, and the next day he replenished the tank truck compartment No. 5 with 110 gallons of kerosene from bulk tank No. 3, and on Friday, July 16, 1943, he delivered to Bailey 20 gallons of kerosene in the same manner and witnessed in the same manner as was the 55 gallons on the previous day. There were no deliveries to Bailey on Saturday, but on Thursday and Friday there had been six other deliveries from this truck tank compartment No. 5 to six other customers, including 40 gallons to a sister of plaintiff Willis Henley, and all these customers; except plaintiff's sister who was not introduced by either party, testified that the deliveries made to them was kerosene.

It was further shown that immediately, and only by a few minutes preceding the purchase by Henley at about six o'clock on Saturday afternoon, the 17th, Robert Yarborough purchased from the Bailey Station three gallons of kerosene, one gallon being in a glass jug, and with him was his tenant, Mack Stewart, for whom the gallon jug was purchased, and both testified that it was water white kerosene, and was obtained by the negro Jones from the kerosene container in the kerosene storeroom. A pint of the liquid taken from this purchase by Yarborough was sent to a chemist, who testified that it was a good grade of kerosene with a safe flash point.

It was shown that the next purchase of kerosene at the Bailey Station immediately succeeding in a few moments that by Henley were by Forrest Phillips and his son Wilborn Phillips. The latter waited upon himself and personally drew the kerosene from the kerosene container in the kerosene store-room, the negro attendant being engaged for the present at something else, and both these witnesses were positive, both by sight and by the subsequent use of the fluid that it was kerosene and nothing else.

It was further shown that the Bailey Service Station was closed throughout the day on Sunday, July 18th. Some time during the night, and within a few hours after the accident, a deputy sheriff, at the request of the Henley family went to the Bailey Service Station, accompanied by the city marshal, and by Brister, an employe of the service station, who unlocked the kerosene storage room, and they made an examination of the kerosene container and found that it contained only water white kerosene, in which connection it may be mentioned that the city marshal had had considerable experience in the oil business and well knew how to tell the difference between kerosene and gasoline. The deputy sheriff was ill at the time of the trial, but the marshal and Brister testified to the above facts.

There was other and additional evidence in behalf of the defendants, all to the same effect as the above, including the testimony of the negro attendant that he filled the Henley can from the kerosene container and that he knew it was kerosene. Most of these witnesses were friends of the Henleys and, except as to the negro Jones, no effort was made to discredit or impeach any of them. If defendants had been required to prove beyond a reasonable doubt that what they placed in the kerosene container in this Bailey Service Station was kerosene and kerosene only, then it would seem that by all accepted standards they so proved it. Against it is the ultimate event that what the Henley boy poured into the lamp was gasoline, and the single witness chain of testimony from the kerosene store-room at the filling station to the lamp, as already mentioned—this chain being entirely by interested witnesses.

It is a well established rule, one from which there seems to be no dissent anywhere, that when, taking the evidence in any case as a whole, any sound and reasonable theory of it may be deduced which will not impute perjury to any witness that theory should be adopted—that it is the duty of the triers of the facts first to undertake to recon-

cile the testimony, and only as the last alternative to adopt that theory which will impute perjury to some of the witnesses. This rule was so stated in Griffith Chan. Prac. Sec. 587 as regards hearings by the Chancellor, and it has equal application to trials by juries. It is in effect so stated in 2 Moore on Facts, Sec. 1048, and as follows: "The duty of a jury and of courts is to reconcile, if they reasonably can, seeming conflicts in evidence without convicting the witnesses of deliberate false swearing," and by a quotation it is added that: "Few rules for determining the result of conflicting evidence are more frequent in occurrence or more satisfactory in practice than this." And the text goes on to say that when as to a material fact a witness may have been innocently mistaken, that view of it should be adopted when to take the opposite course would convict a number of other witnesses of wilful perjury, especially if the latter are disinterested and unimpeached. See also 2 Moore on Facts, Secs. 726 and 856. All these statements are supported by a wealth of authority.

If gasoline was in the kerosene container at the Bailey Service Station then nine persons, six of whom were disinterested and are unimpeached, committed wilful and corrupt perjury. Such a wholesale conviction must be avoided if it can be done on any admissible theory that an opposing witness was innocently mistaken, and if that cannot be done then the dependability of the opposing witness must be considered, or both of these features may be reviewed.

In the first place there is a possibility that the negro Jones, who served as a handy boy on busy Saturday afternoons, doing this and that, on his way to the Henley car or near it may have put down the can of kerosene for some other immediate task and mistakenly picked up a can of gasoline when he put it in the car, not conscious that he had done so. But under all the evidence this possibility is made so remote that it must be put out of the picture, especially as there are three other more reason-

able possibilities or chances that the can was unknowingly switched after its arrival back at the Henley home.

It is admitted that more than a thousand gallons of gasoline and many gallons of kerosene were annually used on the Henley premises, and that three five gallon cans were in use there, and sometimes two of them for kerosene. It is asserted by the witnesses from the Henley family that on this occasion they were entirely out of either gasoline or kerosene; and the impression is sought to be made by their testimony that the principal object of the trip to town on this Saturday afternoon was to obtain lamp fuel, yet their testimony is that when they got home that night they left the can in the car, and that although they had a garage, the car was left in the yard, and that when about night time the following day the can was taken out of the car it was placed in the junk room, and it was to this junk room that it is said the twelve-year-old boy went later and after dark to fill the lamp. Here was an apt setup for a mistake to be made, a reasonable chance that the boy mistakenly or thoughtlessly got hold of a gasoline can instead of that brought from the station on the preceding evening.

And according to a statement made by the boy's father five days after the accident, that was what happened, unless the neighbor who testified to that statement, and who is not shown to have had any bias or interest, is also to be added to the already over-loaded list of perjurers. The statement is disputed by the father, but a significant fact just here is that the station kerosene container had been examined by officers on the previous Sunday night at the request of the Henley family, as has already been mentioned, and there is a significance, too, in the fact that the father denied that he had at any time talked to these examiners, or had heard anything about what they found, although he admits that later he went with one of them to a chemist taking the can to have its contents analyzed. Here then is an overloading of denials.

Although only twelve years old, the boy is shown to have had ample opportunities to know the difference in the color of gasoline which is red, and of kerosene which is water white, and he stated as a witness that he knew that gasoline is dangerous. Yet he admits that he had already poured into the lighted lamp a small tin cup full of the red liquid which he was using, and it was not until he was about to pour in the second cup full that he thought enough of the difference to call to his mother about it, and then the explosion occurred. A twelve-year-old boy is heedless, thoughtless and impetuous as compared to an average adult; he does not as a rule calculate his movements, and goes often without really thinking. And having realized that it was perhaps his mistake that caused the tragic death of his only sister, it was an easy mental process for him at that age to come to the conclusion that he had not in fact made a mistake, and to believe that on his part what ought to have happened was what did happen, and especially so as that was naturally preferred by all those around him. See 2 Moore on Facts, Sec. 899.

And adults are not free from the danger of coming to believe that the facts were not such as bring any carelessness or neglect upon them when a tragedy such as this has happened in their household and when the urge so to think is stronger far than any pecuniary interest that they may have.

As already mentioned, there are two other possibilities which could account for the switching of the cans on the Henley premises, but as the case is to be retried we forbear to pursue them in an opinion already lengthy. We may rest for the time, and so far as this record is concerned, on what has been said as regards the twelve-year-old child. Applying the rule as stated and looking to the considerations mentioned, we must take the course pursued by the court in Chicago, etc., R. Co. v. Stumps, 69 Ill. 409, where the testimony of two boys aged seven

and eleven years was held insufficient as against the testimony of five unimpeached adults.

Finally, we may add that studious examinations of this record in its entirety have convinced us that no human tribunal, court or jury, can safely say, or say at all except arbitrarily, what were the real facts which eventuated in this fatal injury, and the burden of proof being on the plaintiffs, we have seriously considered whether, under the rule announced in Truckers Exchange Bank v. Conroy, 190 Miss. 242, 250, 199 So. 301, and followed in many cases since that time, we should hold that the peremptory charge ought to have been granted. We have concluded, however, to reverse the verdict and judgment as being against the great weight of the evidence, and to remand, that the case may be tried before another jury.

Reversed and remanded.

## Dissenting Opinion.

McGehee, J., delivered a dissenting opinion

After a careful study and consideration of all the testimony in this case, I am of the opinion that the evidence for the defendants, if believed by the jury, would conclusively establish their contention that they placed only kerosene in the storage tank kept for that purpose at the Bailey Service Station. On the other hand, the testimony of the plaintiffs, and of Doc Jones, the negro attendant at the filling station, and that of Mr. Bailey, a witness for the plaintiffs, shows without dispute that the can of petroleum products delivered by Doc Jones into the plaintiff's car came out of the said kerosene storage tank at the filling station; and it is further shown by the testimony of the plaintiffs that this same can, so filled with petroleum products, was carried from the car and placed in an old kitchen or "junk room" at the Henley home about fifteen or twenty minutes before the twelve-year-old son and his little sister went to that room to get the

can to fill the lamp. And it is undisputed that the liquid with which they undertook to fill the lamp was gasoline; and according to the testimony of the plaintiffs, no other can containing gasoline was kept in that room or elsewhere in the house.

I am, therefore, of the opinion that since the testimony of all the witnesses who were present at the filling station fully exonerated the negro attendant of having made a mistake, so as to place the wrong can in Mr. Henley's car, the clear-cut issue was presented for the decision of the jury as to whether or not the members of the Henley household, including the grandfather, who says that he found it necessary to go to his own home immediately after the accident, and get some kerosene for the lamps that night, before some more could be purchased the next day after the funeral, were telling the truth, or whether the testimony on behalf of the defendants was true.

To assume that all of the witnesses were endeavoring to tell the truth the whole case would be left clouded in mystery. I think, therefore, that the judgment for damages appealed from should either be affirmed, or that we should hold that the defendants were entitled to a peremptory instruction. If the theory of the controlling opinion be correct, then in my opinion a peremptory instruction should have been granted. But I think that the case was properly submitted to the jury, and that its decision on the sharply disputed issues of fact should not be disturbed. The CHIEF JUSTICE concurs in this view of the case.